**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-20-148** |
| | * | |
| **GLENDA HODGES,** | * | |
| | * | |
| **Defendant** | * | |

**\*\*\*\*\*\*\***

## GOVERNMENT'S OMNIBUS MOTIONS RESPONSE

On March 10, 2021, a grand jury for the District of Maryland returned a Superseding Indictment that charged Glenda Hodges ("Hodges" or "defendant") with seven counts of wire fraud, two counts of bank fraud, two counts of aggravated identity theft, and one count of bank fraud while on pre-trial release.  These charges stem from the defendant's years-long scheme in which she misappropriated and misused federal grant funds and defrauded a series of individual victims, all in order to benefit herself at the expense of her victims and the non-profit organization she was supposed to be running.  Specifically, the Superseding Indictment alleges a single scheme to defraud setting forth the various methods by which Hodges stole or diverted funds for her personal benefit and to benefit her company.  Then, while on pretrial release for that fraud, the defendant committed yet another fraud in which she victimized yet another elderly woman.

On May 10, 2021, Hodges filed motions to sever counts and exclude evidence (ECF 51), suppress statements (ECF 50), and strike surplusage from the indictment (ECF 49).   For the reasons set forth below, these motions should be denied.

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................. 1

I.  Still I Rise Federal Grant Funding .................................................................. 1

II.  Hodges Establishes the Women's Wellness Center in April 2014 .................... 2

III.  Hodges Uses a Variety of Frauds to Finance WWC ........................................ 3

IV.  WWC's Increasingly Dire Financial Situation................................................. 6

V.  Hodges's Statements ....................................................................................... 9

A.  April 15, 2019 Interview ........................................................................... 9

B.  April 23, 2019 Interview ......................................................................... 10

C.  June 4, 2020 Interview ............................................................................ 11

VI.  While on Pre-Trial Release, Hodges Defrauded Victim 4 ............................. 13

ARGUMENT ............................................................................................................. 17

I.  The Court Should Deny the Defendant's Motion to Sever Counts and Exclude Evidence... 17

II.  The Counts in This Case Were Properly Joined ............................................ 20

III.  The Defendant Has Failed to Establish Sufficient Prejudice to Justify a Severance ......... 24

IV.  Even if the Counts Were Not Charged Together, Evidence of Each of the Other Counts Would Still Properly Be Admitted at Any Trial on the Other Counts......................................... 27

V.  The Court Should Deny the Defendant's Motion to Suppress Statements ....................... 29

VI.  The Court Should Deny the Defendant's Motion to Strike Surplusage ........................... 35

# BACKGROUND

## I.   Still I Rise Federal Grant Funding

In 2005, Glenda Hodges founded Still I Rise ("Still I Rise" or "SIR") and registered it as a nonprofit organization in Maryland.  Between 2010 and 2017, Hodges applied for, and DOJ's Office on Violence Against Women ("OVW") awarded Still I Rise approximately $896,999 in DOJ grants to implement a violence against women program.  In addition, between 2012 and 2017, Prince George's County awarded Hodges an additional $1,179,000 in grants.

Specifically, in September of 2010, OVW awarded Still I Rise a $299,999 grant for a two-year period beginning on October 1, 2010.  In September 2012, this initial grant was supplemented with an additional $297,000 and extended until September 30, 2014.  In September 2014, OVW awarded Still I Rise a $300,000 grant for a three-year period beginning on October 1, 2014.

OVW records show that Hodges electronically filed the grant applications, and that Hodges was the sole authorized representative and financial point of contact for the grants.  The applications Hodges sent to OVW stated that the grant money would be used to fund Still I Rise, which would provide "support and resources" to minority survivors of domestic violence, sexual assault, and stalking.  The applications also listed services that Still I Rise would provide, including legal clinics, food cooperatives, shelter and transitional housing, and a residential life skills center. The organization's stated purpose remained substantially the same throughout the 2010, 2012, and the 2014 application process.

OVW also requires grant applicants to attach detailed budgets specifying how they will spend grant money.  Grant recipients are required to sign acceptance forms acknowledging that "grant funds may be used only for the purposes in the recipient's approved application" and that work or activities not specified in the grant application are disallowed without "prior written approval from OVW."  The 2014 grant award to Still I Rise authorized Hodges to use OVW's

1

money to support five areas of operation over three years[1]:

- $156,000 to pay wages, including Hodges's $12,000 per year stipend.

- $10,002 to pay for travel to OVW-mandated training.

- $4,852 for printed materials, described as "brochures, flyers, and event invitations," and postage.

- $82,346 for counseling services, outreach events, and legal aid clinics.

- $46,800 for costs associated with Still I Rise's increased leased space of 4,635 square feet with "dedicated space" for counseling activities and sexual assault staff.

Between January 2011 and February 2016, OVW thereafter awarded approximately $896,999 in grant funds to Still I Rise, depositing the grant funds via ACH into a Bank of America account ending in 1268 (BOA 1268)—a business checking account opened under the name of Still I Rise and over which Hodges was the sole authorized signer.[2]  In late 2015, Hodges contacted OVW because it appeared that SIR would be exhausting its 2014 grant funding before its expiration, which was supposed to last a period of three years but was ultimately exhausted within 16 months.  This prompted review by OVW that ultimately led to a criminal investigation and this prosecution.  Still I Rise did not receive any additional funding from OVW after February 2016, when Hodges received the final draw from the 2014 grant award.

## II. Hodges Establishes the Women's Wellness Center in April 2014

On March 26, 2014, Hodges organized Still I Rise Comprehensive Support Services & Training, LLC ("CSST"), a company that owned and operated a for-profit weight loss and health clinic called the Women's Wellness Center ("WWC") that was located in Clinton, Maryland. Hodges purchased an old bank building in April 2014 through CSST and converted the building

---

[1] The 2010 and 2012 awards were substantially similar in both areas of operation and dollar amounts.

[2] All bank accounts are identified by the financial institution and the last four digits of the account number.

into WWC.  Hodges was the Chief Executive Officer of WWC.  The "our services" link of the WWC website connected to only two pages—one enumerating the insurance plans WWC accepted and one describing WWC's "weight loss management" program.  WWC did not register as a clinic until November 2014 and did not fully open until January 2015.

### III. Hodges Uses a Variety of Frauds to Finance WWC

As explained in greater detail below, after its inception, WWC quickly began encountering financial problems.  In October 2014, during the same time that WWC was created, Hodges applied for and obtained additional OVW grant funds in the amount of $300,000.  The defendant received the first disbursement of funds from the 2014 grant on January 2, 2015 and then continued to receive disbursements until February 24, 2016.  However, Hodges quickly began diverting the grant funds—which were supposed to be used exclusively for the non-profit Still I Rise as set forth in the grant award—to sustain her failing for-profit business, WWC, and for her own personal benefit.  The following shows some examples of activity on BOA 1268 during the time period for Counts Two through Seven.  All dates are in 2015, and counts are highlighted.

| Date | Activity |
|---|---|
| June 5 | Balance of ($298). |
| June 5 | DOJ ACH of $10,456. |
| June 10 | $20 counter-credit from two $10 checks. |
| June 10 | $1,008 check to Lucy Young. |
| June 11 (Count 3) | $4,000 Check 2404 to Uzochuckwu Unegbu, a physician at WWC. |
| June 23 | DOJ ACH of $14,623. |
| July 9 | DOJ ACH of $15,110. |
| July 13 | $50 reversal of prior debit from Omni Atlanta Hotel. |
| July 15 (Count 4) | $3,500 Check 2429 to CCST Industrial Bank account with notation "July Rent of WWC." |
| July 24 | DOJ ACH of $14,811. |
| July 28 | Two reversals of prior $79 credits. |
| July 29 (Count 5) | $1,003.53 electronic payment to OCWEN for the mortgage on Hodges's personal property in North Carolina. |

| Date | Activity |
|------|----------|
| July 29 | $721.39 electronic payment to OCWEN for the mortgage on Hodges's personal property in North Carolina. |
| August 5 | DOJ ACH of $12,379. |
| August 10 (Count 6) | Check 2445 $2,724 to Celia Hearren with notation "final check - payroll." |
| August 19 | DOJ ACH of $16,112. |
| August 28 | $305.66 electronic payment to Time Warner Cable for North Carolina cable account for Hodges's personal property in North Carolina.[3] |
| September 9 | $1,000 capital contribution from Hodges.  Post-contribution balance was $1,907. |
| September 16 | DOJ ACH of $14,508. |
| September 28 | DOJ ACH of $13,110. |
| September 29 | Counter-credit of $200 consisting of two checks with notations "prayer breakfast" and cash. |
| September 30 (Count 7) | Check 2461 to WWC operating account (M&T 2757) for $5,340 with notation "WWC payroll." |
| October 9 (Count 1) | $134,800 wire from Victim 1 as a result of a business email compromise |
| October 9 | $15,000 withdrawal noted as "owner's draw." |
| October 13 | $16,000 transfer to BOA 5297, which was Hodges's personal savings account.  Prior to the deposit, this account had a balance of $340.75 and there was thereafter almost no activity on the savings account until January 2016, when Hodges returned the $16,000 to SIR to create the appearance that she was making a capital contribution to Still I Rise. |
| October 13 | $30,000 check to WWC's M&T Bank account with the notation "WWC payroll." |
| October 13 | $50,000 check with the notation "SIR and WWC operating expenses" that Hodges deposited into the CSST account at Industrial Bank. CSST was the for-profit company that acted as the umbrella for WWC, not SIR. |
| October 13 | $9,000 transfer to a Bank of America checking account to Two Brothers Auto Wholesale LLC. |
| October 14 | $20,000 transfer to two Bank of America accounts; specifically, a $11,000 transfer to All Transport, Inc. and a $9,000 transfer to Nekpen K. Egharevbya. |
| October 14 - 15 | Several additional checks, though the checks overdrew the balance of the account, were reversed, and generated NSF fees. |

---

[3] Time Warner Cable does not provide service in Maryland.

Notably, the October 9, 2015 wire from Victim 1 came in less than a month before Hodges emailed OVW on November 3, 2015 and stated that "it seems apparent [SIR] will run out of funds before the end of the award.  Unfortunately, some funds that we normally receive from Prince George's county were not received this year."  Ex. 8.

Hodges used the same excuse related to the Prince George's County grant funds when she defrauded Victim 3, as set forth in Counts Eight through Twelve.  Victim 3 is expected to testify that between August 1 and September 30, 2016, Victim 3 was hospitalized after having surgery that led to an infection.  While Victim 3 was recovering, Hodges visited Victim 3 in the hospital and asked her to sign a form so that Hodges could secure a $25,000 loan in Victim 3's name.  Hodges told Victim 3 that Still I Rise was waiting for a $90,000 Prince George's County grant that had already been approved and needed the $25,000 in the interim.  Hodges promised to repay the $25,000 once the county paid the $90,000 grant award and told Victim 3 that she could not obtain the loan herself because she had poor credit.

In early September 2016, Hodges paid for a medical transportation service to transport Victim 3 to a Navy Federal Credit Union ("NFCU") branch in Laurel Lakes, Maryland.  Victim 3 did not know the purpose of the visit to NFCU, did not complete a loan application or sign any paperwork, and did not speak with a bank representative.  Victim 3 thereafter discovered that Hodges used Victim 3's means of identification (specifically, her name, date of birth, and social security number) to acquire a credit card at NFCU, maxed out the $25,000 limit on the card, and failed to make payments on the debt, which caused Victim 3 to go into default.[4]  Records also show that on September 6, 2016, Hodges obtained a $5,000 cash advance on the line of credit and transferred it the next day to her personal NFCU checking account.

---

[4] The account was NFCU 7869 and was opened on August 26, 2016.

Victim 3 reviewed the NFCU credit application with investigators and confirmed that her name, date of birth, and social security number were used to open the account, but identified the following false information on the application, among others:

- The address reported for Victim 3 was 9306 Pine View Lane, Clinton, Maryland. This is Hodges's home address and the address on SIR's corporate registration.
- The phone number was SIR's office number.
- The account contact number was Hodges's personal cell phone number.
- The email address was SIR's executive assistant's email address.

After learning of this fraud, Victim 3 thereafter discovered that Hodges had previously acquired a credit card from M&T bank using Victim 3's personal information and ran up approximately $20,00 in debt on March 10, 2016. Records show that a credit card account ending in 6442 was opened at M&T Bank under the SIR business name, but using Victim 3's name, date of birth, and social security number. As with the OVW grant funding, Hodges used the funds she stole from Victim 3 to prop up WWC and to finance her own personal expenses. For example, the defendant used the M&T account to make a $3,583 payment to WWC's electronic patient file platform, a $1,007 payment to Saks Fifth Avenue, a $91 payment to Waldorf Animal Clinic, and four separate payments totaling approximately $1,735 to LabCorp Holdings.

On April 8, 2016, while Hodges was in the midst of defrauding Victim 3 because of her WWC's severe financial distress, a $72,938 check written from Victim 2 was deposited into EagleBank 1008, one of SIR's business accounts over which Hodges was the sole signer (Count Two). The balance of EagleBank 1008 at the time of the deposit was $26.11. However, Hodges began receiving information related to this check as early as January 2016, with the majority of the communications beginning in mid-March 2016 through the receipt and deposit of the check on April 8, 2016. The check was ultimately returned as fraudulent.

## IV. WWC's Increasingly Dire Financial Situation

Throughout the entire time period of the scheme to defraud, numerous witnesses will testify

that WWC patient volume was low, Hodges was delinquent in employee payroll and taxes, and Hodges was cutting additional corners by, for example, instructing her medical practitioners to inject saline solution into patients rather than Lipo-C, a weight-loss injection therapy requested by patients.

As just one example, the director of operations of Still I Rise and WWC was recruited by Hodges in July 2014 to work for SIR and WWC.  He remained employed by Hodges through November 2015, at which point the financial situation at WWC was "horrible" and Hodges, according to the director, began using the SIR bank account, against his advice, to support WWC. The director of operations is also expected to testify that patient volume at WWC was low, paychecks were returned for insufficient funds, Hodges failed to remit payroll taxes, Hodges misled the board of directors on projected revenue, and Hodges directed employees to sign in to WWC as SIR clients to substantiate the SIR grant funding.

As another example, the medical director at WWC—who was also employed by Hodges throughout the entire scheme to defraud from January 2015 through January 2017—is also expected to testify that patient volume at WWC was low, practitioners at WWC informed him that Hodges instructed them to inject saline solution instead of Lipo-C, and some of his payroll checks were returned for insufficient funds.  The medical director—who was also on WWC's board of directors—also is expected to testify that Hodges misled the other board members about WWC's financial success, patient volume, and employee retention.  In addition, the medical director is expected to testify that the entire time he was at WWC, he saw at most two patients who were referred from SIR and that he also treated men at WWC.

And, as yet another example, the accountant for Still I Rise will testify about Still I Rise's and WWC's finances throughout the entirety of the time period.  Specifically, the accountant, who worked for Hodges from 2010 to 2016, will testify that despite directing Hodges *not* to spend SIR

funds on WWC or otherwise mix the non-profit and for-profit businesses, she nevertheless co-mingled accounts and used grant funding for impermissible expenses.  He is further expected to testify that when he began working for Still I Rise, Hodges told the accountant that the DOJ grant money was to be used only for the violence against women program at Still I Rise.  Further, each quarter, Still I Rise had to submit a quarterly report to OVW that consisted of a written report and an Excel file describing the expenditures.  Hodges wrote the written reports, which the accountant never saw.  Hodges also never gave the accountant her grant proposals or budgets (or any of the grant paperwork), and SIR kept what the accountant referred to as "no accounting records."  The accountant also saw expenses that were clearly disallowable and told Hodges she needed to replace that money in Still I Rise's bank account.  There were other expenditures that—with the benefit of retrospect—the accountant would have coded as disallowable, including payments for a mortgage on a property that did not belong to SIR.  Further, the accountant is expected to testify that he had extensive discussions with Hodges about keeping WWC and SIR separate, including separate accounting and banks.  The accountant also told Hodges not to use DOJ money for the benefit of WWC.

Meeting notes from Still I Rise board meetings—which included the medical director, the accountant, and Victim 3 above, among other board members—memorialize the same.  For example, during a November 2015 board meeting, SIR's accountant stated that WWC was experiencing a cash flow problem.  Ex. 9a ("He noted that at this point in time TWWC is experiencing a cash flow problem.").  Then, in July 2016, the meeting notes reflect that WWC was functioning at less than 50% capacity and that there were budget issues causing the delay in getting Prince George's County funds after July 1, 2016.  The notes also reflect that the original concept of SIR clients coming to WWC was "not being realized" and that there were issues with paying SIR's bills.  Ex. 9b.

Similarly, an FBI financial analyst will testify regarding the business' financial distress, the flow of funds between the various accounts related to SIR and WWC, and each of the counts set forth in the Superseding Indictment. Specifically, the analyst is expected to testify that WWC's funds declined rapidly beginning in the Fall 2014—shortly after its inception—and throughout the entirety of the scheme to defraud.

## V. Hodges's Statements

Hodges was interviewed numerous times throughout the course of the investigation.[5]

### A. April 15, 2019 Interview

On April 15, 2019, the defendant was interviewed by DOJ OIG Special Agent (SA) Rene Olivas and Maryland Office of the State Prosecutor SA Latisha Beal. On that date, at approximately 9:15 a.m., SA Olivas left a voicemail for the defendant on her cell phone, indicating that he was in town and wished to speak with her about Still I Rise. SA Olivas and SA Beal also called another phone associated with the defendant and knocked on the door of the defendant's residence, but no one answered the door. The agents left SA Olivas's business card at the door. Each of these attempts was audio recorded. *See* Exs. 1a – 1c (audio recordings). A short time later, the defendant exited her residence and indicated that she was in the shower. Ex. 1d (audio recording). SA Olivas explained that he wanted to talk to the defendant about the grant SIR received and asked for 30 minutes to speak with the defendant. The defendant indicated that she was about to meet someone, but stated that she could meet at Starbucks up the street. SA Olivas

---

[5] In addition to the three formal interviews discussed below, Hodges affirmatively reached out to DOJ OIG by telephone on September 14, 2017 and November 30, 2017. *See* Exs. 7a and 7b. The defendant's boilerplate motion seeks to suppress the June 4, 2020 interview with law enforcement, and "any other statement which the government may seek to introduce at trial, whether or not such statements are yet known to counsel or are specified herein." ECF 50, ¶ 2. While the defendant's vague motion can be fairly read to seek to suppress the formal interviews with Hodges discussed herein, the government does not understand the defendant to be moving to suppress any evidence of these phone calls or other statements that the defendant initiated to law enforcement.

suggested somewhere quieter, and the defendant agreed to meet SA Olivas at IHOP for 30 minutes. Ex. 1d (time stamp: 3:25).

At approximately 9:45 a.m., SA Olivas and SA Beal met the defendant at IHOP for the interview.  The interview lasted approximately 35 minutes and was audio recorded.  Ex. 2 (audio recording).   During the interview, the agents and the defendant discussed SIR, WWC, WWC's not-for-profit status, and the relationship between SIR and WWC.  After approximately 30 minutes, the defendant noted that it was 10:15 and that she needed to leave.  *Id.* (Time stamp: 30:00).  The defendant indicated that she was willing to meet again with SA Olivas the following week.  The defendant agreed to call SA Olivas to schedule the meeting.  *Id.*  SA Olivas confirmed that, while there was some urgency for the Department of Justice, the meeting was entirely voluntary.  Ex. 2 (time stamp: 34:20).  Hodges replied: "yea."  *Id.*  At the conclusion of the meeting, Hodges said she would look at her schedule and do her best to call them.  The interview then concluded, and the defendant left the restaurant.  *Id.*

At some point after the meeting, Hodges called SA Olivas and left a voicemail to schedule the follow-up interview.  Ex. 3a (audio recording).  At approximately 1:35 p.m., SA Olivas called the defendant back.  This communication was audio recorded.  *See* Ex. 3b (audio recording). During the conversation, Hodges indicated that she was available to meet on April 23 at 11:00 a.m. SA Olivas and the defendant discussed where to meet, with the defendant indicating she would rather the meeting be in public and suggested that they meet at Strayer University.  In discussing that day's meeting, the defendant indicated that she was being friendly and that she was very comfortable with SA Beal and asked if SA Beal would be at the follow-up meeting on April 23. Ex. 3b (time stamp: 3:35).

### B.  April 23, 2019 Interview

On April 22, 2019, SA Olivas called the defendant (with SA Beal) to set up the April 23,

2019 interview.  The call was audio recorded.  The defendant answered and asked to call SA Beal back.  Ex. 4a (audio recording).

Later that day, SA Beal (with SA Olivas) again called the defendant.  The call was audio recorded.  The defendant and SA Beal agreed to meet again at the IHOP at 9:30 a.m. on April 23, 2019.  Ex. 4b (audio recording).

On April 23, 2019, SA Olivas, SA Beal and the defendant met at the IHOP in Clinton, Maryland.  The interview lasted approximately three hours, and was audio recorded.  Ex. 5 (audio recording).  During the interview, the defendant was asked about SIR, WWC and the comingling of accounts from both entities.  Ex. 5 (time stamp: 1:11, 1:13, 2:18).  The agents and the defendant also discussed, among other things, the bank accounts involved in the case (time stamp: 1:14), payments to the defendant's residence in Selma, North Carolina and related utilities using SIR grant funds (time stamp: 1:14:20, 1:28:15), SIR grant funds to pay WWC expenses (time stamp: 1:32), the defendant's personal use of the grant funds (1:28:50, 1:36, 2:33), the $134,000 wire from Victim 1 into BOA 1268 (time stamp: 1:41:55, 2:30:23), and the loan she opened in Victim 3's name while Victim 3 was in the hospital (time stamp: 3:12:30).  After Hodges told the agents to ask her any additional questions they may have (time stamp: 3:11), the interview eventually concluded, and the defendant left the restaurant.  *Id.*

## C.  June 4, 2020 Interview

On May 29, 2020, DOJ OIG SA Amy McAleese contacted the defendant and left a voicemail on the defendant's telephone.  That same day, Hodges returned SA McAleese's call.  SA McAleese indicated that she had follow-up questions regarding the OVW grants.  The defendant agreed to come to the offices of DOJ OIG in Arlington, Virginia on June 4, 2020 to speak with investigators.

On June 4, 2020, the defendant arrived at the office of the DOJ OIG.  The interview took

11

place in a large conference room to ensure proper social distancing due to the COVID-19 pandemic.   In addition to Hodges, SA McAleese, SA Beal, and FBI SA Josh Megli were present.[6] *See* Ex. 6a.  Prior to the interview, SA McAleese made clear that the interview was voluntary, and that Hodges was free to stop answering any questions and can leave at any time.  However, in an abundance of caution, SA McAleese informed the defendant of her *Miranda* rights.  After SA McAleese read aloud the rights along with Hodges, Hodges agreed to speak with the agents and signed a written waiver of her Miranda rights.  Ex. 6b.  Specifically, the defendant was told that she had the right to remain silent and refuse to answer any questions, that anything she said could be used against her, that she had a right to a lawyer (and that, if she could not afford one, one would be provided for her at no cost), and that she had the right to stop answering questions at any time. *See* Ex. 6b.   The defendant questioned why she was being *Mirandized* and SA McAleese responded that it was in an abundance of caution, particularly because Hodges was in DOJ OIG's office space and SA McAleese wanted to ensure that Hodges understood that the interview was voluntary and that she could leave at any time.  The defendant indicated that she had read the statement of rights, understood them, and stated that she wanted to make a statement.  *Id.*  The defendant thereafter signed her name indicating as such, which was witnessed by SA McAleese and SA Megli.  *Id.*

The defendant thereafter discussed with the agents, among other things, Still I Rise, the OVW and Prince George's County grants received by Still I Rise, WWC, the relationship between Still I Rise, WWC, and CSST, the relevant bank accounts, the defendant's personal use of Still I Rise grant funds, the $134,000 wire from Victim 1, communications with a Chinese company (related to Victim 2), and the NFCU and M&T credit accounts opened in Victim 3's name.  *See* Ex.

---

[6] The defendant arrived at DOJ OIG with SIR's executive assistant, who remained in the waiting room during the interview.

6a.  The interview lasted approximately two hours and Hodges thereafter departed in her own vehicle.

## VI. While on Pre-Trial Release, Hodges Defrauded Victim 4

On June 9, 2020, Magistrate Judge Timothy J. Sullivan signed a criminal complaint charging the defendant with wire fraud and bank fraud, in violation of 18 U.S.C. § 1343 and 1344. On July 1, 2020, a grand jury issued an indictment charging the defendant with seven counts of wire fraud and two counts of bank fraud.

On August 17, 2020, the defendant had an initial appearance before Magistrate Judge Gina L. Simms and was released on conditions, including to not commit any other federal, state, or local law.

In October 2020, the government received a tip that a 74-year-old woman (Victim 4) had signed over a large amount of money to the defendant on the understanding that Hodges would return the money, but the defendant was now refusing to do so. Victim 4 is expected to testify that she knew the defendant for many years and, after her health began to decline, Victim 4 decided to move out of state to be closer to her family.  The defendant offered to help Victim 4 prepare for the move.  To that end, Victim 4 gave Hodges copies of her bills and checkbooks from her personal bank account and asked that Hodges mail them for her once Victim 4's social security check was deposited in the middle of the month.  Victim 4 also agreed to lend the defendant Victim 4's vehicle, because the defendant told Victim 4 that her vehicle was in the shop.

Victim 4 also told Hodges that she was the custodian of money left for Victim 4's son by his father in the amount of $75,000 held at Capital One Bank.  Records obtained from Capital One Bank show that an account ending in 7402 was opened on January 26, 2015 with Victim 4 as the account holder.  Hodges told Victim 4 that Victim 4 should transfer the money into an account in Hodges's name with Victim 4 as a trustee while Victim 4 moved out of state.  Hodges told Victim

4 that she would return the money to Victim 4 once she got settled in her new location.

On October 9, 2020, Hodges drove Victim 4 to Capital One Bank.  When they arrived, Hodges and Victim 4 went up to the teller and requested to withdraw the $75,000 in the account. Hodges advised Victim 4 that she should get it in cash.  The teller explained that the most she could give them in cash was $4,000 and the rest would have to be in the form of a certified check. Victim 4 thereafter took out $4,000 in cash and the balance of approximately $71,000 in the form of a cashier's check made out in Victim 4's name.  Hodges took possession of the envelope containing the check and the cash and told Victim 4 they would deposit the money at Hodges's bank later.  The next day, Hodges informed Victim 4 that she had asked the manager of her bank and they would need to have the cashier's check re-issued in Hodges's name in order to deposit it into her bank account.  Records from Capital One confirm that on October 9, 2020, $4,000 in cash and $71,731 in the form of a cashier's check made out to Victim 4 was withdrawn from account 7402.  Bank surveillance footage from that day shows Victim 4 and the defendant at the teller's window at approximately the same time as the cash withdrawal.

On October 13, 2020, Hodges picked up Victim 4 and drove with her to the Capital One Bank where they had a cashier's check made out for approximately $71,000 in Hodges's name. Hodges again accompanied Victim 4 to the teller and provided Victim 4 with a slip of paper with Hodges's full name written down so the check would be correctly addressed.  Bank records show that on October 13, 2020, the cashier's check made out to Victim 4 was returned to the Capital One Bank with the annotation "not used for purpose intended" and a new check was issued made out to "Dr. Glenda F. Hodges" in the amount of $71,731.  Surveillance footage of the bank from October 13, 2020 again shows Victim 4 and the defendant at the teller's window.

After receiving the check, Hodges put the check and accompanying paperwork into an envelope and drove with Victim 4 across the street to the TD Bank.  Hodges wrote the name

14

"Myra" on the front of the envelope and slid it underneath the closed door of the bank.  Victim 4 saw a female employee retrieve the envelope from the floor. Hodges took Victim 4 home and said she would later provide her with copies of the receipts for the money that was deposited.  By October 17, 2020, Hodges still had not provided Victim 4 with receipts for the deposits, and Victim 4 began to feel uneasy about the situation.  Victim 4 called Hodges and asked her to return the money.  When Hodges refused, Victim 4 asked her neighbor to drive her to TD Bank to retrieve the money.  At the bank, Victim 4 and her neighbor explained what had happened to the bank manager and stated that they wanted to withdraw the money because they believed that it had been fraudulently obtained.  The manager explained that because Victim 4's name did not appear on the account; she could not disclose any information about the account and could not withdraw the money.  Victim 4 called Prince George's County Police ("PGPD") to the bank.  While they were at the bank, both Victim 4 and her neighbor began receiving numerous phone calls from the defendant, but they did not answer.  At some point while they were inside the bank talking to PGPD, Victim 4 saw the defendant drive up in Victim 4's vehicle—the vehicle Victim 4 thought Hodges had already returned.  At that point, the neighbor answered one of Hodges's calls and told her that she needed to come into the bank and talk to the police.

Hodges spoke to the police in front of the bank.  Victim 4 demanded that Hodges withdraw the money from the TD Bank account.  The defendant said she did not have the required identification and face mask to enter the bank and make the withdrawal.  The PGPD told the neighbor's husband that he could drive Hodges to her house to retrieve the necessary items, which he did.  However, once they returned to the bank, Hodges said she still did not have all the documents needed to make the withdrawal.  PGPD made Hodges return the vehicle to Victim 4 and Victim 4 went home without retrieving the money.

At this time, Victim 4 learned for the first time from PGPD that the defendant was facing

15

charges for fraud.  When Victim 4 confronted the defendant about this, Hodges said that the charges were "just writing" and that she did not do anything wrong.

Records obtained from TD Bank show that an account ending in 1950 was opened in the name of Glenda F Hodges on September 30, 2019. Hodges was the sole signer on the account. On October 8, 2020, the account had a balance of $3,550, and all deposits into the account between that date and October 21, 2020 are funds withdrawn from Victim 4's Capital One account.

On October 9, 2020, $4,000 in cash (via four separate $1,000 deposits) was deposited into TD Bank 1950 via TD Bank's Automatic Teller Machine ("ATM").  ATM surveillance footage from that day shows the defendant depositing the cash.

On October 13, 2020, the Capital One cashier's check drawn from Victim 4's account and made out to the defendant in the amount of $71,731 was deposited into Hodges's TD Bank 1950 via ATM.  ATM surveillance footage from that day shows the defendant depositing the check.

By October 14, 2020, Hodges spent the $3,500 that had been in her account prior to the deposits from Victim 4's account.  In the days after the deposit of the $71,731 check, Hodges spent approximately $26,487 of Victim 4's money, as follows:

| Transaction Posting Date | Amount | Method | Entity | Running Total of Victim 4 $ Spent |
|---|---|---|---|---|
| 10/14 | $ 355.68 | DCP | Philmark Collision Center | $ 85.51 |
| 10/14 | $ 39.23 | DCP | Barnabas Liquors | $ 124.74 |
| 10/15 | $ 5,727.50 | Check | Clinton Foreign Cars[7] | $ 5,852.24 |

---

[7] As yet another connection, Hodges also used SIR funds to make payments to Clinton Foreign Car Services at various times between July 2013 and May 2015.  Specifically, Hodges used $21,720 from BOA 1268 to pay checks to Chase loan 9112 ($13,120.38) and Chase 3714 ($8,600). Records show that Hodges refinanced her home mortgage with Chase loan 9112 and, prior to 2012, obtained a Chase credit card account ending in 3714 in the name of SIR.  Purchases the defendant made with the Chase 3714 card, however, were not expenditures that were authorized under the OVW grant.  For instance, Chase 3714 was used to make recurring purchases at Clinton Foreign Car Services in February and November 2013, July 2013, November 2013, October 2014, and February 2016, as well as payments to Spa World Centreville in July 2012, January 2013, and February 2014, and a pet pharmacy throughout 2013 and 2015.

| Transaction Posting Date | Amount | Method | Entity | Running Total of Victim 4 $ Spent |
|---|---|---|---|---|
| 10/15 | $ 7,500.00 | Check | Mr. Abraham Hodges | $ 13,352.24 |
| 10/15 | $ 197.51 | E Check | Pepco | $ 13,549.75 |
| 10/15 | $ 8,000.00 | Cash | ATM | $ 21,549.75 |
| 10/16 | $ 300.00 | DCP | Cash App Glenda Hod | $ 21,849.75 |
| 10/19 | $ 1,693.98 | Check | AYT | $ 23,543.73 |
| 10/19 | $ 3.04 | DCP | MoveOn.org | $ 23,556.77 |
| 10/19 | $ 1,911.42 | DCP | Geico | $ 25,468.19 |
| 10/19 | $ 12.99 | DCP | Amazon Prime | $ 25,481.18 |
| 10/21 | $ 1,005.89 | Check | PG County | $ 26,487.07 |

In December 2020, TD Bank closed TD Bank 1950 on suspicion of fraud and returned the remaining approximately $49,000 left in the account to Victim 4. To date, despite repeated requests, the defendant has not returned to Victim 4 any of the remaining $26,487.07 that she stole.

## ARGUMENT

**I. The Court Should Deny the Defendant's Motion to Sever Counts and Exclude Evidence**

Rules 8(a) and 14 govern the Court's resolution of Hodges's motion to sever. The former provides that an indictment "may charge a defendant in separate counts with two or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." The Fourth Circuit "ha[s] interpreted the latter two prongs of this rule flexibly," requiring only that the joined offenses "have a 'logical relationship' to one another." *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005) (quoting United *States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir. 1992). Such a relationship exists "when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." *Id.* at 385. "Rule 8(a) permits very broad joinder because of the efficiency in trying the defendant on related counts in the same trial." *Id.* Thus, the standard for joinder is not "onerous." *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003). And, "the general rule is that counts charged in the same indictment will be joined

at trial." *United States v. Samuels*, 970 F.2d 1312, 1314 (4th Cir. 1992); *see also United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995) (noting that joinder is "the rule rather than the exception").

If joinder under Rule 8(a) is proper, "then the defendant's only recourse is to convince the court that the charges should be severed under Rule 14—a difficult task." *United States v. Blair*, 661 F.3d 755, 770 (4th Cir. 2011) (citing *Cardwell*, 433 F.3d at 387). The incidents where joinder of offenses is proper, but severance is nevertheless required are limited to "rare" case where joinder would "prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 768.

To that end, a defendant moving "for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice, and it is not enough to simply show that joinder makes for a more difficult defense." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (internal citations omitted); *United States v. Hackley*, 662 F.3d 671, 684 (4th Cir. 2011) ("It is not enough for the defendant to show that severance offers him a better chance of acquittal.") (internal quotation marks omitted). This high threshold for severance reflects the "well-recognized" principle "that joint trials serve the public interest in economy, convenience, and the prompt trial of the accused." *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988); *Blair*, 661 F.3d at 768-69 ("[T]he prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses to should be tried in a single proceeding.") (internal citations and quotation marks omitted). In fact, "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . .that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying . . ." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987); *United States v. Cooper*, 134 F.3d 364 (4th Cir. 1998) (noting that separated offenses may be joined if "the evidence supporting the separate counts overlaps so that the same evidence would be admissible at separate trials").

18

Indeed, rather than the radical remedy of severance, courts have long favored limiting instructions to the jury. *See Blair,* 661 F.3d at 769 (limiting instruction cited as factor in determining possible misjoinder of offenses under Rule 8(a) resulted in no "actual prejudice" and therefore did not constitute reversible error); *United States v. LaRouche*, 869 F.2d 815, 831 (4th Cir. 1990) ("We have . . . made clear that curative instructions given to the jury by the district court go a long way in eliminating any prejudice resulting from the spillover effects of [improper] joinder."); *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (noting that even in the rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice") (citing *Marsh*, 481 U.S. at 211). The denial of a motion to sever is reviewed only for "clear prejudice." *United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008).

When a defendant claims that joinder is prejudicial because she wishes to testify on some but not all of the counts in an indictment, the defendant must "make[] a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quotation and citations omitted). To do so, "a particularized showing must be made concerning the testimony the defendant wishes to give and his reasons for remaining silent on the joined counts," which allows the Court to "make an independent evaluation of whether the defendant will be prejudiced to an extent that outweighs the interest favoring joinder." *United States v. Werner*, 620 F.2d 922, 930 (2d Cir. 1980). As the Fourth Circuit has explained, "no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *United States v. Ranaldson*, 386 F. App'x 419, 425 (4th Cir. 2010) (citing *Goldman*, 750 F.2d at 1225). Moreover, "[i]n making such a showing, it is essential that the defendant present enough information—regarding the nature

19

of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying." *Id.*

## II. The Counts in This Case Were Properly Joined

Here, the defendant concedes that certain counts are properly joined, but moves to sever the counts into five separate groups:  Count One; Count Two; Counts Three through Seven; Counts Eight through Eleven; and Count Twelve.  Thus, if granted, the defendant's request would result in five separate trials, each with substantially similar witnesses, testifying about similar (in some cases completely identical) means by which the defendant committed fraud.  Such a request is wholly without merit.

A plain reading of the Superseding Indictment makes clear that Counts One through Nine (wire fraud and bank fraud) are all related to the same scheme to defraud OVW and individual victims to keep WWC afloat and enrich Hodges personally.  Counts Ten and Eleven are aggravated identity theft counts that incorporate and are based on the same conduct as Counts Eight and Nine. The purpose of Hodges's scheme was to steal money from whomever she could, using the same lies and fraudulent pretenses, all to keep WWC running so she could continue to profit.  The fact that she defrauded multiple institutions and individuals in the course of her scheme is not a basis for severance; the separate counts are simply executions of the same overall scheme to defraud.

Indeed, while the initial paragraphs of the Superseding Indictment detail the misuse of OVW grants funds awarded to SIR, paragraph 23 of the Superseding Indictment alleges that Hodges continued the scheme as follows:  "[w]hen her companies were financially distressed, HODGES used fraudulent means to inject additional funding into Still I Rise and WWC."  The Superseding Indictment then sets forth those various means of executing the scheme to defraud,

including defrauding Victim 1, Victim 2, and Victim 3, followed by expenditures involving SIR, WWC, and for the defendant's personal benefit. The Superseding Indictment thereafter alleges that the defendant committed seven counts of wire fraud and two counts of bank fraud—all to execute and attempt to execute the same scheme to defraud. As such, Counts One through Eleven clearly "are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a); *see also United States v. Fattah*, 858 F.3d 801, 819 (3d Cir. 2017) (holding "different offenses represent[ed] different components of a single enrichment scheme" and were properly joined where each charge "involved a series of false representations about business entities owned or represented by Fatta," and "had the effect of transferring ill-gotten gains to 259 Strategies, which Fattah used as his personal bank account"); *United States v. White*, 737 F.3d 1121, 1132–33 (7th Cir. 2013) (denying severance of wire fraud and bankruptcy fraud where "the indictment alleges a single scheme to defraud homeowners and lenders through EHNS's mortgage bailout program; according to the indictment, the bankruptcy filings were part of the EHNS program, and also served as the scheme's cover-up"). Moreover, Counts One through Eleven are closely interrelated in a number of significant ways. First, the counts all involve the same businesses, namely Still I Rise and WWC. Second, the counts involve the same bank accounts opened in the name of or involving SIR, including BOA 1268. Third, all counts involved interrelated financial flows, in that the defendant used whatever mechanism she could to keep SIR and WWC afloat, consistently intermingling the funds from the OVW and Prince George's County grants, Victims 1 through 3, and other sources of income, to thereafter spend the intermingled funds on SIR, WWC, and her personal expenses. Fourth, all of dates alleged for Counts One through Eleven are between June 11, 2015 and August 26, 2016, establishing a sufficient temporal nexus. *See United States v. Ginyard*, 65 F. App'x 837, 839 (3d Cir. 2003) (upholding the denial of a motion to sever because there was "a sufficient connection and nexus between the various schemes: the common bank

account, the name, the company's name and the time period," noting that "[m]ost of the charged offenses took place between January 1995 and July 1995, which creates a temporal connection" and that deposits into the same bank account "was the transactional nexus for all the fraud schemes."); *United States v. Kelley*, No. CR 19-483, 2021 WL 601502, at *3 (E.D. Pa. Feb. 16, 2021) ("The alleged offenses are properly joined" because '[t]hey are of a 'similar character' as they all involve Mr. Kelley's alleged schemes run through his business for his personal enrichment.").  In short, when Hodges ran out of money from one victim, she simply moved on to the next one and used a similar manner and means, as alleged in the Superseding Indictment, to con them in order to support herself and WWC.

A brief summary of each of the Counts illustrates these points of overlap and the "logical relationship" between Counts Three through Seven (which the defendant concedes are properly joined) and Counts One, Two, and Eight through Eleven:

- Counts Three through Seven involve the deposit of SIR grant funds into BOA 1268, which is in the name of SIR and controlled by Hodges, between January 2015 and February 24, 2016 (when the SIR grant funds ran out), and then the use of those funds for WWC and personal expenses.

- Count One involves a $134,000 wire into BOA 1268, which is in the name of SIR and controlled by Hodges, and then the use of those funds for WWC and personal expenses.  The deposit occurred on October 9, 2015—just ten days after Count Seven—and the funds were depleted by October 15, 2015.  This wire came into SIR's BOA 1268 less than one month after Hodges told OVW that it was going to prematurely run out of SIR grant funds.  Hodges told OVW that the reason SIR had run out of money was because SIR had not received Prince George's County grant funds.

- Counts Eight through Eleven involve the fraudulent opening of credit accounts in Victim 3's name on March 10, 2016 (M&T Bank) and August 26, 2016 (NFCU)— but on behalf of Still I Rise.  Victim 3 was a former employee and Board member of Still I Rise.  March 10, 2016 was less than two weeks after the final disbursement of grant funds to BOA 1268 on February 24, 2016.  The M&T credit account was opened under the SIR business name, but using Victim 3's name, date of birth, and social security number.  The application for the NFCU credit account used Hodges's and SIR-related contact information, including Hodges's personal address (which is the same address used on SIR's corporate registration), SIR's office number, and the email address of SIR's manager as the email address.  Hodges told Victim 3 that she

needed to open the NFCU account to obtain money for SIR because SIR had not yet received Prince George's County grant funds. Despite both accounts being associated with SIR, as with the other Counts, Hodges used the funds for purchases related to WWC and for her personal use.

- Count Two involves the deposit on April 8, 2016—in between the two credit accounts opened using Victim 3's information but on behalf of SIR—of a $72,938 check written from Victim 2 into EagleBank 1008, one of SIR's business accounts over which Hodges was the sole signer.

In addition, Count Twelve relates to Counts One through Eleven in that the defendant was on pre-trial release for those counts when she committed the fraud against Victim 4, as alleged in the indictment, pursuant to 18 U.S.C. § 3147. Indeed, the Grand Jury found probable cause that the defendant committed Count Twelve while on release, in violation of 18 U.S.C. § 3147. Thus, one aspect of the story that the government must prove at trial is the fact that the defendant was on conditions of release when she committed the offense alleged in Count Twelve. And while there is an argument to be made that violations of § 3147 can merely be proven up at sentencing, and need not necessarily be presented to the jury, *see, e.g.*, *United States v. Fitzgerald*, 435 F.3d 484, 487 (4th Cir. 2006) ("Section 3147 . . . creates a sentencing enhancement"); *United States v. Lewis*, 660 F.3d 189, 192 (3d Cir. 2011) ("[I]t is fairly well-established that § 3147 is a sentencing enhancement, not a crime") (citing cases); *but see United States v. Samuel*, 296 F.3d 1169, 1173 (D.C. Cir. 2002) ("[T]he government first asserts that 18 U.S.C. § 3147 is not an offense at all, but merely a sentencing provision that applies to convictions for other offenses. We are not so sure . . . [Indeed], the legislative history of § 3147 is ambiguous as to whether the section authorizes an independent criminal offense"), it is equally true that the government can, out of an abundance of caution, exercise its prosecutorial discretion to allege violations of § 3147 in the Indictment and ask the jury to find the relevant facts. *Cf. United States v. Hairston,* 409 F. App'x 668 (4th Cir. 2011) (jury found violation of 18 U.S.C. § 3147 beyond a reasonable doubt); *United States v. Kreitinger*, 576 F.3d 500, 502 (8th Cir.

23

2009) (defendant "was indicted for wire fraud, in violation of 18 U.S.C. §§ 1343 and 3147(1)");

*United States v. Ordonez*, 305 Fed. Appx. 980, 981 (4th Cir. 2009) (unpub.) (defendant was

"indicted for violating 18 U.S.C. § 3146(a)(2) . . . and 18 U.S.C. § 3147 . . . "); *United States v.*

*Mazarky*, 499 F.3d 1246, 1247 (11th Cir. 2007) (defendant was indicted for various crimes

committed while on release); *United States v. Carter*, 413 F.3d 712, 714 (8th Cir. 2005) (jury

convicted defendant of all counts in Indictment charging violations of various federal statutes,

including § 3147); *United States v. Gillon*, 348 F.3d 755, 757-58 (8th Cir. 2003) (calling into

question whether post-*Apprendi*, a violation of 18 U.S.C. § 3147 must be set forth in the

indictment, but finding that any such error was harmless because it was proved beyond a

reasonable doubt at trial).  Thus, as it  stands, the pending Superseding Indictment contemplates

proof of the fact that the defendant was on release as to Counts One through Eleven at the time

she committed the instant offenses, rendering the presentation of facts relating to this prior

criminal conduct integral to the government's case and, thus, clearly interrelated of a sufficient

nature to prohibit severance.

Given the overlap between each of the charges against the backdrop of five different trials

that would necessarily involve "duplicating witness testimony, impaneling additional jurors, and

wasting limited judicial resources," all counts "should be tried in a single proceeding."  *Hawkins,*

776 F.3d at 206 (quoting *United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008)).

### III. The Defendant Has Failed to Establish Sufficient Prejudice to Justify a Severance

Hodges has also failed to establish that there is a "serious risk that a joint trial would

compromise a specific trial right . . . or prevent the jury from making a reliable judgment about

guilt or innocence." *Zafiro*, 506 U.S. at 539.   The defendant falls far short of establishing a

"genuine" and "strong showing of prejudice." *Goldman,* 750 F.2d at 1225. As set forth above,

although each of the counts are in furtherance of the same objective and scheme to defraud, there is

24

no serious risk that the jury will confuse or conflate the evidence as it relates to the individual counts.  Similarly, there is no reasonable basis to suggest that the jury will find the defendant guilty of one count simply because of the introduction of evidence related to another count, especially when that evidence would be admissible against the defendant regardless, as set forth below.  *See White*, 737 F.3d at 1133 ("It should have been fairly easy for the jury to compartmentalize the evidence that applied only to Helton from evidence pertaining to the other two defendants . . . ."). The defendant's specific example that the jury will not be able to separate the two "alleged bank fraud[s] involving elderly victims," is without merit.  Indeed, there is no reason to believe that the jury would not be able to "compartmentalize the evidence that applied only to" Victim 3 (Counts Eight through Eleven) and the evidence that applied to Victim 4 (Count Twelve).  *Id.*  At best, the defendant's argument is that "severance offers [her] a better chance of acquittal"—which is not enough.  *Hackley*, 662 F.3d at 684.  Indeed, Hodges does not cite a single case or legal authority supporting her argument for severance in the circumstances presented here.

The defendant's argument that she may wish to testify as to some counts and not others does not fare any better.  At its core, Hodges's argument is that she *may* wish to testify solely as to certain counts to challenge the testimony of particular victim witnesses.  This vague claim falls far short of the "convincing showing" the defendant must make that she "has both important testimony to give concerning one count and strong need to refrain from testifying on the other."  *See Ranaldson*, 386 F. App'x at 425.  This court recently considered and squarely rejected a similar argument when defendants sought to sever false statements charges from underlying bribery and corruption charges.  *United States v. Fitzgerald*, No. CR 1:17-CR-00506, 2021 WL 210532, at *36 (D. Md. Jan. 21, 2021).  There, the false statements charges—which stemmed from lies the defendants told federal agents investigating the scheme—were "directly related to the underlying substantive offenses of bribery."  *Id.*  The Court thus concluded that there would be substantial

overlap in the evidence across the charges the defendants sought to sever, as "it would appear more than likely that the Defendants would in fact need to delve into the alleged bribery scheme itself to demonstrate why the statements were not false or material." *Id.* Such is also the case here, where the government's evidence about Counts One through Twelve will *all* involve discussion of the defendant's misrepresentations to obtain money and property to support herself, including her businesses.

In addition to overlap, the Court in *Fitzgerald* further concluded the defendants had failed to "demonstrate a strong need to refrain from testifying on the other charges" or otherwise make any showing of "strong prejudice" required to establish the need for severance. *Id.* Again, such is also the case here, where the defendant has made a generalized claim that she may wish to testify as to some counts and not others. Moreover, this argument mischaracterizes the evidence in this case. This is not a "he-said, she-said" situation where the government's case "primarily rel[ies] on the testimony of a sole witness" as to certain counts. Motion, ECF 51 at 9. To the contrary, the government's case as to these counts will include evidence from financial institutions of false statements and inaccuracies in documents and evidence relating to how Hodges obtained and thereafter used the fraudulently obtained funds, in addition to victim testimony. Unlike the cases cited by the defendant, this is not a case where the quantum of proof is substantially different as to different counts (nor has the defendant cited a single case for the proposition that the nature of evidence as to a single count, standing alone, would be a sufficient basis to support severance). Rather, the evidence in this case will primarily involve the false statements made by Hodges to various institutions and individuals, as well as evidence as to how she spent and used the fraudulently obtained funds.

Further, because each of the counts are factually interconnected, any decision by the defendant to testify about the facts of one count would open the door to cross-examination on

related specific instances of conduct that bear on her credibility, regardless of whether the additional counts were severed.  *See* Fed. R. Evid. 608(b).  For example, if the defendant wished to take the stand to counter an individual victim's testimony related to the frauds in Counts One, Two, and Eight through Twelve, the government would clearly be permitted to cross examine the defendant regarding her need for money to support Still I Rise and the failing business of WWC, including her attempts to misuse the Still I Rise funds for her personal benefit and to fund WWC.  Indeed, the fraudulent nature of the charges against the defendant go to the core of the defendant's credibility, regardless of which yet-identified counts about which she may choose to testify.

## IV. Even if the Counts Were Not Charged Together, Evidence of Each of the Other Counts Would Still Properly Be Admitted at Any Trial on the Other Counts

Even if the counts were not charged together in this case, evidence of each count would still properly be admitted at any trial on the other counts as both direct evidence and/or as "other act" evidence under Rule 404(b).  Rule 404(b) permits the introduction of evidence of other wrongs to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," but not to prove the defendant's character.  Fed. R. Evid. 404(b).  For Rule 404(b) evidence to be admissible, it must be "(1) relevant to an issue other than the general character of the defendant; (2) necessary to prove an element of the charged offense; and (3) reliable."  *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004).  This three-part test is not an especially difficult one to meet.  Relevance is the lowest of the evidentiary thresholds; it is defined for these purposes to include any evidence that is "sufficiently related to the charged offense," *United States v. Rawle*, 845 F.2d 1244 n.3 (4th Cir. 1988); *see also United States v. Powers*, 59 F.3d 1460, 1465 (4th Cir. 1995), has some "plus value," and is "worth consideration" by the jury with respect to the issues at trial, *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997).  Evidence is "necessary," for the purposes of Rule 404(b), where it supplies information

concerning an essential part of the crimes on trial, or where it furnishes part of the context of the crime. *United States v. Mark*, 943 F.2d 444, 448 (4th Cir. 1991). Finally, evidence is deemed "reliable" for purposes of Rule 404(b) so long as it has a sufficient factual basis that it could conceivably be credited by a rational and properly instructed juror. *United States v. Bailey*, 990 F.2d 119, 123 (4th Cir. 1993); *see also United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996); *United States v. Mills*, 995 F.2d 480, 485 (4th Cir. 1993).

"Rule 404(b), however, limits only the admission of evidence of acts extrinsic to one charged, but does not limit the admission of evidence of intrinsic acts." *United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010) (citation omitted). "Other acts are intrinsic when they are 'inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.'" *Id.* (quoting *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996)); *see also United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007) (noting that evidence is intrinsic if it is necessary to "provide context relevant to the criminal charges"); *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994) (Rule 404(b) "other crimes" distinguishable from "evidence of uncharged conduct [arising] out of the same series or transactions as the charged offense, or [evidence that] is necessary to complete the story of the crime on trial."); *United States v. Loaya*, 107 F.3d 257, 263 (4th Cir. 1997) (evidence of similar conduct after last overt act in indictment held "direct evidence of scheme to defraud, not Rule 404(b) evidence").

Thus, at a trial on Counts Three through Seven, evidence of the additional income related to Victim 1 (Count One), Victim 2 (Count Two), and Victim 3 (Counts Eight through Eleven) would be properly admitted because the facts surrounding these counts are necessary to complete the story of the defendant's fraudulent conduct related to SIR and WWC and because they are "inextricably intertwined" with evidence of the other. Specifically, all counts are admissible evidence related to the financial accounting necessary to show the dire financial situation of SIR and WWC.

Moreover, the intermingling of the various sources of fraudulently obtained funds, as well as the unlawful expenditures, is evidence that underlies each of the counts in the Superseding Indictment. The overlapping evidence on these counts further demonstrates how all of the Counts are intertwined, just as WWC, Still I Rise, and Hodges herself (and all of their respective finances) were all inextricably intertwined.  And, as discussed above, the fact that the defendant is charged with committing Count Twelve while on pre-trial release pursuant to Counts One through Eleven, the facts relating to the defendant's previous criminal conduct plainly are intrinsic to the relevant context, "arose out of the same series of transactions as the charged offense," and is "necessary to complete the story of the crime on trial." *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008).

In the alternative, evidence of each of the counts would be admissible in a trial on Counts Two through Seven pursuant to Rule 404(b) because the evidence of the frauds related to Victims 1 through 3 demonstrates, among other things, Hodges's motive, intent, knowledge, absence of mistake, and *modus operandi* for defrauding OVW and the other victims in order to support her failing for-profit business, WWC, and for her own personal use.

## V.  The Court Should Deny the Defendant's Motion to Suppress Statements

Hodges moves to suppress her June 4, 2020 interview with law enforcement, and "any other statement which the government may seek to introduce at trial, whether or not such statements are yet known to counsel or are specified herein."  Motion, ECF 50, ¶ 2.  The motion does not provide the Court or the government with a fulsome recitation of the facts; an explanation as to why those facts amount to a violation of Hodge's rights; or a discussion of the legal authorities pursuant to which Hodges seeks relief.  Nevertheless, the government understands the defendant's motion to argue that the three formal interviews conducted of the defendant on April 15, 2019, April 23, 2019, and June 4, 2020—which were initiated by law enforcement—were not voluntary.  This motion is wholly without merit.

The Fifth and Sixth Amendments guarantee a suspect the right against self-incrimination and the right to counsel. *See* U.S. Const. amend. V; U.S. Const. amend. VI; *Miranda v. Arizona*, 384 U.S. 436 (1966). "A statement is voluntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). *Miranda* warnings are only required in *custodial* interrogation; therefore, failure to give *Miranda* warnings in a *noncustodial* interview does not support claim that statement was involuntary. *Id.* For a statement to be involuntary under the Due Process Clause, it must be "extracted by . . . threats or violence"; or "obtained by direct or implied promises" or "the exertion of . . . improper influence." *Id.* The focus of the inquiry is on law enforcement's behavior, and whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired" by that behavior. *Braxton*, 112 F.3d at 780-81; *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987).

In determining voluntariness of a statement, the court examines the "totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. *United States v. Elie,* 111 F.3d 1135, 1143-44 (4th Cir. 1997); *Braxton*, 112 F.3d at 780-82.

Although *Miranda* warnings are not required during non-custodial interviews, they are required for custodial interviews. *Miranda*, 384 U.S. at 444-45. The test for determining whether an individual is "in custody" for *Miranda* purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty,* 468 U.S. 420, 440 (1984) (internal quotations omitted). The key question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood his position" as being "in custody." *McCarty,* 468 U.S. at 422. Facts

30

relevant to the custodial inquiry include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) (quotations omitted).

If the defendant is in custody during the interview, to establish a valid waiver of *Miranda* rights, the government must demonstrate that a defendant's waiver was made: (1) voluntarily; and (2) knowingly and intelligently. *See Maryland v. Shatzer*, 559 U.S. 98, 104 (2010); *United States v. Cristobal*, 293 F.3d 134, 139-40 (4th Cir. 2002). At the same time, ultimately, "[t]he burden of proof is on the party who seeks to suppress the evidence." *United States v. Parks*, No. CR 1:18-CV-00317, 2019 WL 2931460, at *2 (D. Md. July 8, 2019) (citing *United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)), *aff'd*, No. 19-4922, 2021 WL 915770 (4th Cir. Mar. 10, 2021)).

The court "engage[s] in the same inquiry when analyzing the voluntariness of a *Miranda* waiver as when analyzing the voluntariness of statements under the Due Process Clause." *Cristobal*, 293 F.3d at 140 (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986). An involuntary waiver occurs only when the totality of the circumstances demonstrates there was "'a substantial element of coercive police conduct'" that led the defendant to waive his rights. *Id.* at 141.

The second prong of the test (knowledge and intelligence) examines whether the suspect waived his *Miranda* rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). There are no particular words,

phrases, or statements a suspect must utter or make to effectively waive his *Miranda* rights.

*United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014) (quoting *Burket v. Angelone*, 208 F.3d

172, 198 (4th Cir. 2000)).  To the contrary, "[a] suspect impliedly waives his *Miranda* rights

when he acknowledges that he understands the *Miranda* warning and then subsequently is willing

to answer questions."  *Id*.  To that end, the question becomes whether the warnings "adequately

convey" to a suspect his rights as required by *Miranda*.  *Florida v. Powell*, 559 U.S. 50, 54

(2010).  Ultimately, "'the main purpose of *Miranda* is to ensure that an accused is advised of and

understands the right to remain silent and the right to counsel.'"  *United States v. Dire*, 680 F.3d

446, 475 (4th Cir. 2012) (quoting *Berghuis*, 560 U.S. at 383).  A suspect need not know every

possible consequence of waiving his *Miranda* rights for his waiver to be valid.  Instead, he must

simply understand "that he may choose not to talk to law enforcement officers, to talk only with

counsel present, or to discontinue talking at any time."  *Colorado v. Spring*, 479 U.S. 564, 574

(1987).

 In examining both prongs of this test, the Fourth Circuit considers "the totality of the

circumstances, including the background, experience, and conduct of the defendant."  *Burket*,

208 F.3d at 199.  In particular, the court may examine "'the suspect's intelligence and

education, age and familiarity with the criminal justice system, and the proximity of the waiver

to the giving of the *Miranda* warnings."  *Dire*, 680 F.3d at 474 (quoting *Correll v. Thompson*,

63 F.3d 1279, 1288 (4th Cir. 1995)).

 Courts regularly rely on agent's testimony regarding the giving of *Miranda* warnings.

*See, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 314-15 (1985) (proceeding to analyze the relevant

issues after the agent "testified that he read the *Miranda* warnings aloud from a printed card

and recorded [the defendant's] responses"); *United States v. Hasan*, 747 F. Supp. 2d 642, 668

(E.D. Va. 2010) (citing "no basis for any claim of a constitutional requirement that the

*Miranda* warnings be recorded by audio, video, or memorialized in a written record," and relying on the agent's testimony at the evidentiary hearing that he had provided *Miranda* warnings from memory to the defendant), *aff'd sub nom. Dire*, 680 F.3d 446. *Accord, e.g.*, *United States v. Wilder*, 304 F. Supp. 3d 464, 469 (D. Md. 2018) ("Despite the fact that the reading of the *Miranda* warnings was not recorded, the Court does not credit [the defendant's] testimony that they were not provided"); *United States v. Gualtero*, 62 F. Supp. 3d 479, 484 (E.D. Va. 2014) (summarizing case law to the effect that "a video or tape recording of Defendant's interrogation and statements is not constitutionally required").

The audio recordings of the defendant's interviews in April 2019 clearly establish that the interviews were non-custodial and voluntary. On both occasions, the defendant (who is highly educated) agreed to be interviewed, established the place and time to be interviewed, drove herself to the interview location, was interviewed in a public location (an IHOP restaurant), and established the time period for her interviews. Indeed, during the first interview on April 15, 2019, the defendant ended the interview after approximately 30 minutes and agreed to reach out to SA Olivas to schedule another interview the following week—which she did. During the call setting up the second interview, the defendant indicated that she was being friendly with the agents and that she was comfortable with SA Beal. During that call, the defendant also established the time and place for that second interview. Toward the end of the second interview, SA Olivas and SA Beal indicated that they could ask follow-up questions at a later time, at which time the defendant encouraged the agents to continue their questioning. There can be no argument that the defendant's will was "overborne" or her "capacity for self-determination critically impaired" by any law enforcement behavior. *Braxton*, 112 F.3d at 780-81.

The June 4, 2020 interview was also non-custodial and voluntary.  The defendant was contacted via telephone on May 29, 2020 and asked to come in for a voluntary interview.  The defendant agreed to meet at the DOJ OIG offices on the following Thursday, June 4, 2020.  The defendant drove herself to the office, where she was interviewed in a large conference room in the presence of three investigators.  She was told she was free to leave at any time both before the interview began, during the review of her *Miranda* rights, and again after Hodges questioned why she was being read her rights.   It is clear from the totality of circumstances, therefore, that Hodges's "freedom of action" was in no way "curtailed to a degree associated with formal arrest."  *McCarty,* 468 U.S. at 440.  Indeed, when viewed objectively, "a reasonable man in [Hodges's] position" would not have understood herself to be "in custody."  *McCarty,* 468 U.S. at 422.

Even assuming *arguendo*, the interview was custodial, however, prior to the interview, the defendant was informed of her *Miranda* rights.  Hodges agreed to speak with the agents and signed a written waiver of her *Miranda* rights.  Ex. 6b.  Specifically, the defendant was told that she had the right to remain silent and refuse to answer any questions, that anything she said could be used against her, that she had a right to a lawyer (and that, if she could not afford one, one would be provided for her at no cost), and that she had the right to stop answering questions at any time.  *See* Ex. 6b.   The defendant indicated that she had read the statement of rights, understood them, and indicated that she wanted to make a statement.  *Id.*  The defendant thereafter signed her name indicating as such, which was witnessed by SA McAleese and SA Megli.  The defendant therefore was read and waived her *Miranda* rights, then failed to unambiguously invoke her right to remain silent or to an attorney at any point during the interview. The defendant therefore has no basis to argue that his *Miranda* rights were violated.

34

Nor can the defendant argue that her *Miranda* waiver or statements were involuntary. With respect to the characteristics of the accused, Hodges—who was 69 years old at the time of the interview—is highly educated and did not suffer from any notable mental impairments. And at no point during the interview did the defendant appear to be physically or mentally suffering, particularly to a degree indicating that her free will was overborne.

With respect to the circumstances of the interview, the agents did not subject the defendant to "any form of physical coercion or deprivation." *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995). Further, the agents limited the interview to approximately two hours, interviewed the defendant during the day, and used a conversational tone with the defendant throughout the interview. *United States v. Nichols*, 438 F.3d 437, 443-44 (4th Cir. 2006) (finding no coercion where officers used "conversational" tone during four hour interview); *cf. United States v. Byers*, 649 F.3d 197 (4th Cir. 2011) (finding no coercion where 21 year old defendant was arrested and placed in interview room where he was handcuffed to wall and questioned about a murder for 14 hours). To that end, the investigators did nothing to break the defendant's free will.

## VI. The Court Should Deny the Defendant's Motion to Strike Surplusage

The defendant moves to strike alleged surplusage from the indictment, namely the "allegations concerning the injection of saline solution into patients of [WWC] and the issuance of nonsufficient fund checks to her WWC employees." ECF 49, at 1. This motion is without merit.

Rule 7(d) provides that, "[u]pon the defendant's motion, the court may strike surplusage from the indictment." Fed. R. Crim. P. 7(d). "The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant not material to the charges made in the

indictment, or not essential to the charge, or necessary, or inflammatory." *United States v. Poore*, 594 F.2d 39, 41 (4th Cir. 1979) (citations omitted).  "[A] motion to strike surplusage from the indictment should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United States v. Williams*, 445 F.3d 724, 734 (4th Cir. 2006) (quoting *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998)).

As set forth above, evidence that the defendant issued nonsufficient fund checks to her employees, did not pay payroll taxes, and asked her employees to inject saline all go to the basic premise of the case:  that WWC was in financial distress and that Hodges did whatever was necessary to keep her failing for-profit company (and herself) afloat.  Moreover, evidence of each of these facts would be admissible because they are both intrinsic to the instant case and/or properly admitted pursuant to 404(b).  As such, the defendant cannot establish undue prejudice by the inclusion of these allegations within the indictment.  *See Williams*, 445 F.3d at 734 (finding that the district court did not abuse its discretion by denying motion to strike allegations about a prior murder when evidence related to the murder was introduced at trial, was not unfairly prejudicial, the jury did not view the indictment, and the jury was instructed that the indictment is not evidence).

## CONCLUSION

The Court should deny Hodges's motions.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

/s/ *Caitlin R. Cottingham*
Kelly O. Hayes
Caitlin Cottingham
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

      I, Caitlin R. Cottingham, hereby certify that a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all counsel of record.  The proposed audio exhibits will be provided to the Court and defense counsel.

<div style="margin-left:40%">

By:       /s/
           Caitlin R. Cottingham
           Assistant United States Attorney

</div>

Date: July 8, 2021